**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | |
| | * | |
| **DEMAR A. BROWN,** | * | **CRIMINAL NO. GJH-18-335** |
| **JASHON C. FIELDS, and** | * | |
| **KAMAR O. BECKLES,** | * | |
| | * | |
| **Defendants.** | * | |
| | * | |
| | * | |
| | ******* | |

**GOVERNMENT'S CONSOLIDATED RESPONSE**
**TO DEFENDANTS' PRE-TRIAL MOTIONS**

The defendants were arrested pursuant to ample probable cause during the commission of a series of burglaries. Investigators later secured numerous search warrants and court orders to lawfully obtain additional evidence in the case. The defendants made a number of statements, all either not in response to custodial interrogation or pursuant to intelligent and voluntary waivers of their *Miranda* rights. Some of the statements by defendants Beckles and Fields, and the affidavits they filed with this Court, do raise *Bruton* issues. However, these issues can be addressed in ways less drastic than severance. Finally, the defendants' discovery-related motions are either premature, or are unsupported by law and fact. For the reasons set forth below, the defendants' motions should all be denied.

I.      <u>PROCEDURAL HISTORY</u>

On June 19, 2018, a Grand Jury in the District of Maryland returned a four-count Indictment charging Demar A. Brown, Jashon C. Fields, and Kamar O. Beckles with Conspiracy, in violation of 18 U.S.C. § 371 (Count One), and Interstate Transportation of Stolen Property, in violation of 18 U.S.C. § 2314 (First Paragraph) (Counts Two through Four). In July and August,

2018, initial appearances and arraignments were held for each of the defendants. Each of the defendants have been ordered held in the custody of the United States Marshal pending trial.

On June 11, 2019, the Grand Jury returned a four-count Superseding Indictment. The Superseding Indictment charges all of the same offenses, however additional overt acts are included and defendant Fields is now charged only in Count One.

A motions hearing is scheduled for November 18, 2019 at 9:30 a.m. and a two-week jury trial is scheduled to commence April 13, 2020.

The defendants have each several substantive pretrial motions[1], which the government will group as follows, for the Court's convenience:

| MOTION | DEFENDANT | DKT. # |
|---|---|---|
| **SUPPRESSION MOTIONS** | | |
| Motions to Suppress Evidence | Brown | 110 |
| | Beckles | 92 |
| | Fields | 77 |
| Motions to Suppress Statements | Brown | 109 |
| | Beckles | 91 |
| | Fields | 76 |
| **OTHER PRETRIAL MOTIONS** | | |
| Motion to Sever | Fields | 78 |
| | Brown | 103[2] |
| **DISCOVERY MOTIONS** | | |
| Motions for Disclosure of Rule 404(b) Evidence | Brown | 105/106 |
| | Beckles | 93 |
| | Fields | 80 |
| Motions for Disclosure of Experts | Fields | 81 |
| | Brown | 103 |
| Motion for Disclosure of Co-Defendants' Statements | Brown | 107 |
| Motion for Disclosure Pursuant to Rule 12 | Brown | 108 |
| Motion to Require Prosecution to Review and Confirm Witness Backgrounds | Brown | 111 |

---

[1] Defendants Brown (Dkt. #104) and Fields (Dkt. #82) have filed motions for leave to file additional motions. The government does not object at this time, but reserves the right to object to the filing of additional defense motions in the future, to the extent that they endanger the scheduled trial date.

[2] The government consents to Defendant Brown's motion to adopt his co-defendant's motions, (Dkt. #103), and will assume his motion will be granted for purposes of this response.

For the reasons set forth below, each of these motions should be denied.

## II.     FACTUAL BACKGROUND

### A.   The Baltimore County Police Department's Investigation of a Series of Burglaries

Beginning in late 2017,[3] Detectives with the Baltimore County Police Department began investigating a series of residential burglaries targeting residences around the Pikesville, Cockeysville, and Franklin communities of Baltimore County, Maryland. The burglaries were committed from late 2017 through January 26, 2018.

Witnesses and surveillance cameras in the area of several of the burglaries observed a dark-colored or black SUV, described as a Ford Explorer or Expedition, leaving the area. Surveillance video at several of the crime scenes also showed multiple subjects involved in the burglaries, including one wearing a top with a reflective logo in the center of his upper back.

During one of the burglaries on December 18, 2017, a housekeeper startled three burglars who had broken into her employers' home. They all wore dark clothes and masks, and one brandished a handgun. Surveillance video recorded during a December 28, 2017, burglary a suspect can be seen using a "walkie-talkie" style two-way radio to communicate with someone.

### B.   The January 26, 2018 Arrest of the Defendants

On January 26, 2018, Baltimore County police units were working a surveillance detail in relation to the burglaries. That evening, a police officer was dispatched to a recently reported burglary at 14101 North Blenheim Road, Phoenix, Maryland 21131. The victim residence is in a low-density residential area, with homes set far from the street, and each other, and significant areas of forested land. The officer met with the victim who stated upon returning home, he

---

[3] Some reports and legal process from early in the investigation include an October 13, 2017, burglary as part of the series of burglaries involved in this investigation. Following further investigation, it was determined that there was not sufficient evidence to conclusively tie this burglary to the other incidents, beginning November 29, 2017.

observed that the front door was broken and all the interior doors in the house were open. The victim stated all the drawers and cabinets in the master bathroom and bedroom were opened.

Knowing that in previous cases involved in this trend the suspects targeted multiple homes in one area, responding police personnel began searching the area for a dark-colored Ford Explorer that had previously been identified as a suspect vehicle. An officer that was operating an unmarked police vehicle arrived in the area of the burglary and observed a dark green Ford Explorer bearing North Carolina registration FBR7704 traveling slowly on Blenheim Road. Based on the manner in which the vehicle was being operated, the officer and a helicopter from the Baltimore County Aviation Unit continued to follow the vehicle as it pulled into a driveway. As the officer pulled in behind the vehicle, the driver of the Ford Explorer exited the vehicle and asked the officer what the problem was. Once the driver noticed the police helicopter and the officer's police vest, he turned and began to flee. Officers gave chase and were able to detain the subject in the rear yard of the residence next to 3805 Blenheim Road, Phoenix, Maryland. The subject was identified as Demar A. Brown.

While detaining Brown, officers noted that a telephone on Brown's person was ringing, and that information visible on the face of the device showed incoming calls from (443) 922-8170. Additional responding officers were able to view, through the exterior windows of the Ford Explorer, a safe matching the description of the one stolen in the earlier burglary at 14101 Blenheim Road, as well as what appeared to be bags of other property. During a search of Brown's person, incident to his arrest, investigators seized:

- a two-way radio, tuned to channel 5;

- a Wyndham hotels keycard;

- a complimentary breakfast ticket for January 27 at the Towson Days Inn (a Wyndham hotel) located at 8712 Loch Raven Boulevard for room number 127; and

- 2 mobile phones: a ZTE Model Z320 and an LG Model LGMP260.

Based on video surveillance and witnesses in the prior burglaries, investigators were aware that the suspects involved in this string of burglaries typically committed the burglaries on foot while a driver remained in a getaway vehicle in close proximity. Because of this, investigators established a perimeter around the area immediately after detaining Brown.

Investigators began checking houses in the area of Blenmont Court. During the check of the area, investigators discovered a broken glass rear door at the residence located at 3 Blenmont Court in Phoenix, Maryland. There were no suspects found inside the residence and the residence was secured. Later, the owner of the house responded to the location and advised of missing property from the Master bedroom.

Later that night, several unmarked police units parked at the parking lot of the Chestnut Grove Presbyterian Church, located at 3701 Sweet Air Road in Phoenix, Maryland. This area was a part of the police perimeter, at the intersection of Sweet Air Road and Blenheim Road. Investigators noticed two male subjects in the rear of the parking lot near the wooded area behind the church. The subjects were dressed in dark clothing and laying prone on the ground without any verbal commands from police. Detectives detained and arrested the subjects, later identified as Jashon Fields and Kamar Beckles.

A Detective spoke with Fields while picking him off the ground and walking him to a police unit. Without any solicitation from the Detective, Fields stated that he was at the location to "meet with some prostitutes." Fields stated that he came from Georgia, and was looking to have a good time with the prostitutes as he was visiting the area. Fields identified one of the prostitutes

as "Madonna." The Detective informed Fields that he would take the information and attempt to figure things out.

As officers approached Fields, a second subject was observed behind a tree with his head down. That subject, later identified as Kamar O. Beckles, was wearing dark sweatpants, black combat style boots, and a jacket with a reflective emblem in the center of his upper back, consistent previous video surveillance of a subject involved in the burglaries. Beckles did not make any initial statements at the time of his arrest.

Both Fields and Beckles were placed under arrest. During a search incident to arrest of Beckles, a beanie style cap was found in his jacket with a large quantity of cash contained therein. Further, a cellular phone was recovered from his breast pocket. This telephone was confirmed to have number 443-922-8170, the same number noted as having called Brown at the time of his detention. During a search incident to the arrest of Fields, investigators seized a mobile phone. Further, both Beckles and Fields were found to be in possession of Wyndham key cards identical to the card recovered from Brown. Fields' key was recovered from his sock and Beckles card recovered from his pocket.

**C.** **The Voluntary, *Mirandized* Statements of Defendants Beckles and Fields**

On January 27, 2018, in the morning following the nighttime arrests, investigators spoke with Fields, Brown and Beckles after advising them of their Rights per Miranda and Rights to Prompt Presentment. The interviews were conducted at Baltimore County Police Headquarters and were audio and visually recorded.

Brown was interviewed first and provided investigators with a current address of 720 Hudson St, Winston-Salem NC 27105 before he invoked his right to remain silent and questioning was terminated. Ex. 1 (Brown's Miranda Waiver Form).

Fields was interviewed second. He waived his *Miranda* rights, and agreed to a voluntary interview with investigators. Ex. 2 (Fields' Miranda Waiver Form). During his interview, Fields ultimately admitted to having travelled in the seized Ford Explorer to an unknown area in Baltimore County on the night of January 26, 2018. He claimed that he had exited the vehicle and fled when he became aware of what Beckles was doing.

Beckles was interviewed third. He waived his *Miranda* rights, and agreed to a voluntary interview with investigators. Ex. 3 (Beckles' Miranda Waiver Form). Beckles ultimately admitted that he was in debt and that no matter what, he never could get ahead. He admitted that he had travelled in the seized Ford Explorer with Brown and Fields and that he had used his feet to break the door to gain entry to at least one of the houses on January 26, 2018. Beckles also provided the insight that all three suspects were cousins.

D. **The Execution of Search Warrants and Court Orders for Additional Evidence**

1. ***Execution of a Warrant to Search the 2003 Ford Explorer***

The Ford Explorer bearing NC registration was identified to be a dark green 2003 Ford Explorer with a registered owner of J Penny C Express Trucking at 720 Winston Hudson St, Winston Salem NC 27105. In the vehicle at the time of its seizure, investigators noted the following while looking through the exterior windows:

- A safe matching the one stolen from in the earlier burglary at 14101 Blenheim Road;

- A hydraulic jack;

- A large dolly;

- Gloves and hat/mask in the rear seat; and

- Bags containing unknown property.

Very early in the morning of January 27, 2018, obtained a warrant from the District Court of Maryland, for Baltimore County, and searched the 2003 Ford Explorer in the crime lab garage of Baltimore County Police Headquarters. *See* Ex. 4. Upon searching the vehicle, investigators discovered money, personal documents belonging to one of the families that reported being burglarized, jewelry, cell phones, a crowbar, chisels, and other items of evidentiary value.

### 2.   *Execution of Warrants to Search the Days Inn Towson, Rm 127 and 128*

Also in the very early morning hours of January 27, 2017, following the arrests of the defendants, a Baltimore County Police Detective responded to the Towson Days Inn Towson located at 8712 Loch Raven Blvd, 21286. The hotel manager informed the Detective that room 127 was rented in the name and identification of Kamar Beckles, and that the rental also included room 128. The Detective reviewed hotel video surveillance from January 25, 2017, and saw a dark green Ford Explorer arrive at the location shortly before Beckles entered the lobby. The SUV appeared to be of the same type as the 2003 Ford Explorer driven by Brown just prior to his arrest. All of the seized room key cards taken from Brown, Beckles and Fields were also given to management at the Towson Days Inn, who confirmed that they were keys issued by the hotel.

Based on this information, investigators obtained warrants authorizing the search of Rooms 127 and 128 of the Towson Days Inn. Exhibits 5 and 6. Inside the rooms investigators seized cell phones, a mask, gloves, mail in Beckles' name, Fields' Georgia driver's license, and a magazine loaded with 9mm ammunition. Investigators also seized items stolen from burglarized residences, such as jewelry, collector's coins, foreign currency, and keys to a Land Rover.

### 3.   *Execution of Warrants to Seize DNA Samples from the Defendants*

On January 27, 2018, Baltimore County Police obtained warrants authorizing the seizure of saliva samples from the defendants for DNA comparison. Exhibits 7, 8, and 9.

### 4.   *Execution of a Warrant to Search Seized Devices*

On January 29, 2019, investigators obtained a warrant from the District Court of Maryland, for Baltimore County, specifically authorizing the search of the four mobile devices seized from the defendants, the two cell phones and a GPS system seized from the Ford Explorer, and the three cell phones seized from the Days Inn hotel rooms. Ex. 10. Examination of these devices pursuant to the warrant identified substantial evidence of the charged offenses.

### 5.   *Execution of Warrants to Search Two North Carolina Residences*

Before invoking his right to remain silent, Brown provided a home address of 720 Hudson Street, Winston-Salem, North Carolina. This matches the registered address for the 2003 Ford Explorer. Brown was also heard on jail calls shortly after his arrest communicating with Gaunzie Hart, with whom he shares a child. Investigators determined Hart's current address was 4447 Old Carver School Road, Winston-Salem, North Carolina. During the recorded calls, Brown spoke to Hart in coded language suggesting that he was giving her directions to remove or tamper with evidence at the two residences to which Brown had access.

On January 30, 2018, Search Warrants were obtained from the Superior Court of Forsyth County, North Carolina by the Winston-Salem Police Department and Baltimore County Police Department for both addresses. Exhibits 11 and 12. Property identified as belonging to victims from the series of Baltimore County, Maryland burglaries under investigation was recovered from both addresses.

### 6.   *Execution of Warrants to Search Electronic Accounts*

On January 30, 2018, the Circuit Court for Baltimore County issued warrants authorizing the search and seizure of information associated with three Google accounts linked to devices seized in this investigation. Exhibits 13, 14, and 15. On September 5, 2019, this Court issued a

warrant authorizing the search of sixteen different social media, email, and other electronic accounts. Ex. 16.

### 7. *Execution of Court Orders to Obtain Historical Cell Site Data*

Between February 1, 2018, and March 23, 2018, Baltimore County Police obtained separate orders from the Circuit Court for Baltimore County to obtain historical cell site location information for eleven different electronic devices. Exhibits 17 through 27. Each of these is styled an "Order Authorizing Disclosure of Telecommunications Records" and cites to 18 U.S.C. § 2703(d). *See, e.g.* Ex. 17, at p. 27. Each of the Baltimore County Circuit Court orders was issued pursuant to a finding that "there is probable cause to believe the records and information sought are relevant and material to an ongoing criminal investigation." *Id.*

On June 8, 2018, this Court issued an order, pursuant to 18 U.S.C. § 2703(d) for historical cell site location information, relating to a device that made incoming calls to a phone seized from the Ford Explorer during the burglaries on December 18, 2017. *See* Ex. 28, ¶10. This device is not believed to have been used by any of the charged defendants.

### E.   Further Investigation Uncovers Evidence of the Georgia Burglaries

Further investigation revealed evidence of Brown and Beckles' involvement in three burglaries in the Milton, Georgia area on January 24, 2018. Historical cell site location information placed their devices at the scene of the burglaries, surveillance at one victim residence captured an image of what appears to be the same jacket with a reflective emblem that Beckles was arrested wearing, and two of the Milton victims identified property stolen from their homes within the property later recovered from the Ford Explorer and the Towson hotel rooms.

**III.**     **THE DEFENDANTS' MOTIONS TO SUPPRESS SHOULD BE DENIED**

Each of the defendants has filed a motion to suppress evidence to be introduced against them (Dkt. #110 (Brown), 92 (Beckles), and 77 (Fields)), as well as any statements they have made (Dkt. # 109 (Brown), 91 (Beckles), and 76 (Fields)). Each of these motions should be denied.

**A.**     **There was Probable Cause to Support the Arrests of the Defendants**

Each of the defendants in this case was arrested in a public place, based on probable cause.

> It is well-settled under Fourth Amendment jurisprudence that a police officer may lawfully arrest an individual in a public place without a warrant if the officer has probable cause to believe that the individual has committed, is committing, or is about to commit a crime. Probable cause to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.
>
> Probable cause is judged by an analysis of the totality of the circumstances, which are weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement. Under this pragmatic, common sense approach, we defer to the expertise and experience of law enforcement officers at the scene. At bottom, the proper standard is intended to protect citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime, while at the same time giving fair leeway for enforcing the law in the community's protection. And it is a fluid concept that turns on the assessment of probabilities, not on any formula such as is applied to proof at trial. Thus, even seemingly innocent activity may provide a basis for finding probable cause.

*United States v. Dickey-Bey*, 393 F.3d 449, 453–54 (4th Cir. 2004) (internal citations and quotation marks omitted). It is also well-established that a search pursuant to a lawful arrest does not violate the Fourth Amendment. *See e.g., United States v. Kellam*, 568 F.3d 125, 136 (4th Cir. 2009) (citing *Chimel v. California*, 395 U.S. 752, 762–63 (1969)).

### 1. Investigators had Probable Cause to Arrest Brown

Officers encountered Brown while searching the area of a recently reported burglary for a dark-colored SUV, possibly a Ford Explorer or Expedition, matching the description of the vehicle seen by witnesses and surveillance at several of the recent burglaries. An officer that was operating an unmarked police vehicle arrived in the area of the burglary and observed a dark green Ford Explorer bearing North Carolina registration FBR7704 traveling slowly on Blenheim Road. Based on the manner in which the vehicle was being operated, the officer and a helicopter from the Baltimore County Aviation Unit continued to follow the vehicle as it pulled into a driveway. As the officer pulled in behind the vehicle, the driver of the Ford Explorer exited the vehicle and asked the officer what the problem was. Once the driver noticed the police helicopter and the officer's police vest, he turned and began to flee. Officers gave chase and were able to detain the subject in the rear yard of the residence. Observation from outside of the vehicle revealed a safe matching one stolen in the most recent burglary, masks, and gloves. Based on this evidence, and the information developed in the investigation at that time, under the totality of the circumstances officers had probable cause to arrest Brown and conduct a lawful search incident to his arrest.

### 2. Investigators had Probable Cause to Arrest Beckles and Fields

Investigators knew from witnesses and surveillance in prior burglaries that multiple subjects were working together, and that they would typically commit burglaries of multiple nearby residences on foot with a getaway vehicle waiting nearby. Officers learned of a second burglary nearby, and established a perimeter around the area of the burglaries. Later that night, in a relatively quiet residential neighborhood, officers encountered Fields and Beckles in the rear of a church parking lot adjoining a wooded area. The subjects were dressed in dark clothing and laying prone on the ground without any verbal commands from police, as though attempting to

evade the ongoing search being conducted by police. When confronted, Fields provided a statement about being there to meet prostitutes that was plainly not credible.

Beckles was in possession of a phone that had been used to make multiple calls to Brown during Brown's arrest and detention. He was also wearing a sweatshirt with a reflective emblem in the center of his upper-back, matching that seen in surveillance at multiple victim residences. Based on this evidence, and the information developed in the investigation at that time, under the totality of the circumstances officers had probable cause to arrest Beckles and Fields, and to conduct lawful searches incident to the arrests.

**B.    The Search Warrants Executed in the Investigation Were All Valid and Supported by Probable Cause**

The defendants each seek to suppress all of the evidence seized by the government during their arrests or during the execution of search warrants. Defendants Beckles and Fields specifically challenge the searches of their persons, conducted incident to arrest, as well as the execution of warrants to obtain DNA samples, and to search rooms 127 and 128 of the Towson Days Inn, and the 2003 Ford Explorer. *See* Exhibits 4 through 9. Investigators have also executed another seven warrants and court orders to search seized devices, electronic accounts, two residences tied to Brown in North Carolina. Exhibits 10 through 16. The defendants do not point to any specific deficiency or defect in any of the warrants. This is unsurprising, because each of these warrants was facially valid, supported by ample probable cause, and issued by a neutral magistrate. The evidence seized pursuant to these warrants should not be suppressed.

> In reviewing a search warrant application, a magistrate must make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . , including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Illinois v. Gates*, 462 U.S. 213, 238 (1983). "To begin with, warrant affidavits are normally drafted by nonlawyers in the midst and haste of a criminal investigation." *United States v. Clenney*, 631 F.3d 658, 665 (4th Cir. 2011) (internal citation and quotation marks omitted). A court reviewing a magistrate judge's assessment of probable cause must accord his or her decision "great deference," and should not "invalidate a warrant 'by interpreting [an] affidavi[t] in a hypertechnical, rather than a commonsense, manner.'" *United States v. Lalor*, 996 F.2d 1578, 1581 (4th Cir.), cert. denied, 510 U.S. 983 (1993) (quoting *Gates*, 462 U.S. at 236). "So long as the magistrate had a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Gates*, 462 U.S. at 236 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).

A commonsense reading of each of the affidavits in this case demonstrates that they were all supported by probable cause. The affidavits set forth the facts of the investigation in lengthy detail, tying each of the places to be searched to specific information obtained in the months'-long investigation of these burglaries. *See* Exhibits 4 through 16. Each warrant also describes with particularity the place to be searched and the evidence to be seized.

Even if a court finds that an affidavit failed to establish probable cause, a defendant is not entitled to have the evidence from the search suppressed. The Supreme Court has held that when officers seize evidence in good faith reliance on a facially valid warrant issued by a magistrate or judge, and the affidavit is later found to lack probable cause, the evidence is not subject to the exclusionary rule of the Fourth Amendment and is admissible in the government's case-in-chief. *United States v. Leon*, 468 U.S. 897 (1984) (affidavit of experienced narcotics officer who acted in reliance on information provided by informant of "unproven reliability" held to lack probable cause, but evidence seized by agent who acted in good faith reliance on the facially valid warrant

was not subject to suppression). *See also United States v. Edwards*, 798 F.2d 686, 690 (4th Cir. 1986). Here, the facts in each affidavit clearly establish probable cause that evidence related to the burglaries will be found at the locations to be searched. The defendants do not establish, or even allege, any grounds on which the supposed deficiencies of the warrants render officers' reliance on the warrants objectively unreasonable. Because the warrants were all supported by probable cause and the officers acted in good faith in securing and executing them the motions to suppress should be denied.

C.   **The Court Orders for Historical Cell-Site Location Information Were All Supported by Findings of Probable Cause or Executed in Good Faith Reliance on Binding Precedent**

Between February 1, 2018, and June 7, 2018, investigators obtained twelve separate court orders pursuant to the Stored Communications Act, 18 U.S.C. § 2703(d), to obtain historical cell site location information relating to various electronic devices. Exhibits 17-28. The first eleven of these orders were issued by the Circuit Court for Baltimore County between February 1, 2018, and March 23, 2018. Although styled as court orders, each of the Baltimore County orders was issued pursuant to an explicit finding of probable cause and as such meets the legal standard for a search warrant. The order issued on June 7, 2018, by the U.S. District Court for the District of Maryland was for location information related to a device associated with the phone number (347) 785-8580, which is not currently known to have been used by any of the defendants.

On May 31, 2016, the Fourth Circuit issued an *en banc* decision holding that the Government does not violate the Fourth Amendment when it obtains historical cell site location information from a service provider with a court order issued under § 2703(d). *United States v. Graham*, 824 F.3d 421, 427 (4th Cir. 2016) (*en banc*) (abrogation recognized by *United States v. Mero*, 755 Fed. Appx. 336, 337 (4th Cir. 2019)). The *Graham en banc* decision was explicitly cited in the government's June 7, 2018, application. Ex. 28 at n.1.

On June 22, 2018, the Supreme Court ruled in *Carpenter v. United States*, that the government must generally obtain a search warrant supported by probable cause before acquiring historical cell site location information from a wireless provider. 138 S.Ct. 2206, 2221 (2018). Notwithstanding *Carpenter*, the Government's acquisition of the historical cell site records at issue here is not subject to suppression because several established good-faith exceptions to the exclusionary rule apply. *See United States v. Chavez*, 894 F.3 593, 608 (4th Cir. 2018) (rejecting defendant's argument on appeal that cell site data should have been suppressed for failure to obtain a warrant because investigators reasonably relied on Stored Communications Act and court orders, and good-faith exception to exclusionary rule applied).

### D. The Defendants' Voluntary, *Miranzided* Statements Should not be Suppressed

#### 1. Brown's Statement Falls Within the Routine Booking Exception to *Miranda*

Defendant Brown provided what he stated was his North Carolina address to investigators prior to invoking his right to remain silent. To the extent that this statement was made prior to any *Miranda* warnings, the defendant providing his address falls within the "exception to *Miranda*'s coverage for routine booking questions securing 'biographical data necessary to complete booking or pretrial services.'" *See United States v. D'Anjou*, 16 F.3d 604, 608 (4th Cir. 1994) (quoting *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (plurality opinion)).

#### 2. Fields' Spontaneous Statement at the Time of His Arrest was not in Response to Custodial Interrogation

At the time of his arrest, defendant Fields made an unsolicited statement about being in the area to meet with prostitutes. A custodial statement made prior to *Miranda* warnings is not inadmissible if it is made spontaneously, and not in response to any words or actions by the police that they should know are reasonably likely to elicit an incriminating response. *See United States v. Montieth,* 662 F.3d 660, 669 (4th Cir. 2011).

### 3.   Beckles' and Fields' *Mirandized* Post-Arrest Statements are Admissible

After their arrests, Beckles and Fields was taken to Baltimore County Police headquarters for separate interviews. Investigators advised each defendant of his rights verbally and in writing. Beckles and Fields both signed and initialed the written Miranda Rights Waiver, which clearly set forth the rights they was waiving. Exhibits 2 and 3. Neither defendant invoked his right to counsel at any time during the interview, before or after executing the written waiver of his Miranda rights. Fields and Beckles each made intelligent and voluntary waivers of their *Miranda* rights.

The interviews of Beckles and Fields were conducted in a non-coercive manner, with no improper or false promises or inducements. Beckles and Fields post-arrest statements were voluntary and are admissible. "[T]he test for determining whether a statement is voluntary is 'whether the confession was extracted by any sort of threat or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of improper influence.'" *United States v. Braxton,* 112 F.3d 777, 786 (4th Cir. 1997) (Murnaghan, J., dissenting) (quoting *Hutto v. Ross*, 429 U.S. 28, 30 (1976)) (internal citations omitted). "The mere existence of threats, violence, implied promises, improper influence, or other coercive police activity, however, does *not* automatically render a confession involuntary." *Id.* at 780 (Williams, J., for the court) *(*quoting *United States v. Pelton,* 835 F.2d 1067, 1071 (4th Cir. 1987) (emphasis added). Rather, "[t]he proper inquiry 'is whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired.'" *Id.* (internal citations omitted).

Ordinarily, only "coerced confessions procured by means 'so offensive to a civilized system of justice that they must be condemned,'" are suppressed. *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994) (quoting *Miller v. Fenton*, 474 U.S. 104, 109 (1985)). The reviewing "court[] must consider 'the "totality of the circumstances," including the characteristics of the

defendant, the setting of the interview, and the details of the interrogation,'" in this regard. *Braxton,* 112 F.3d at 780 (internal citations omitted) (quoting *Pelton,* 835 F.2d at 1071). "The Government bears the burden of proving by a preponderance of the evidence that the statement was voluntary." *Id.* at 781.

The circumstances here weigh heavily in favor of the knowing and voluntary character of the statements made post-arrest by defendants Beckles and Fields. The interviews were not conducted in a coercive atmosphere, and the officers' routine post-arrest questioning did not critically impair either defendant's capacity for self-determination. Under the totality of the circumstances test, the statements made by the defendants were entirely voluntary and in no way "offensive to a civilized system of justice." *Ledbetter,* 35 F.3d at 1067. The defendants' motions to suppress statements should be denied.

## IV.   THE DEFENDANTS' MOTIONS TO SEVER SHOULD BE DENIED

Defendant Fields has moved to sever the defendants in this case, (Dkt. #78) and Brown seeks to join his motion (Dkt. #103). For the reasons stated below, these motions should be denied.

During his *Mirandized*, post-arrest interview, Beckles gave a statement implicating himself as well as Brown and Fields. On November 20, 2018, Beckles filed a notarized affidavit with this Court, signed under penalty of perjury, implicating himself and Fields, while attempting to falsely exculpate Brown. (Dkt. #52).

Likewise, in Fields' *Mirandized*, post-arrest interview, he gave a statement implicating himself and Beckles. On November 16, 2018, Fields also filed a notarized affidavit with this Court, signed under penalty of perjury, implicating himself and Beckles, while attempting to falsely exculpate Brown. (Dkt. #49).

When defendants are properly joined under Federal Rule of Criminal Procedure 8(b), as in this case, severance under Federal Rule of Criminal Procedure 14 is justified "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). The Fourth Circuit has held that "[a] defendant making a motion for severance pursuant to Rule 14 has the burden of demonstrating a strong showing of prejudice." *United States v. Goldman*, 750 F.2d 1221, 1225 (4th Cir. 1984) (*citing United States v. Niederberger,* 580 F.2d 63 (3d Cir. 1978), *cert. denied,* 439 U.S. 980 (1978)). The party moving for severance must establish that "actual prejudice would result from a joint trial, and not merely that a separate trial would offer a better chance of acquittal." *United States v. Reavis*, 48 F.3d 763, 767 (4th Cir. 1995) (citations and internal quotations omitted), *cert. denied,* 515 U.S. 1151 (1995). Moreover, Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief, if any, to the district court's sound discretion. *Zafiro*, 506 U.S. at 538.

It is well-settled that there is a preference in the federal system for joint trials of defendants who are indicted together. *Id*. at 537. Indeed, the Fourth Circuit has held that "[b]arring special circumstances, . . . the general rule is that defendants indicted together should be tried together for the sake of judicial economy." *United States v. Rusher*, 966 F.2d 868, 877 (4th Cir.) (internal quotations omitted), *cert. denied*, 506 U.S. 926 (1992). "Generally, we adhere to the rule that defendants charged with participation in the same conspiracy are to be tried jointly." *United States v. Akinkoye*, 185 F.3d 192, 197 (4th Cir. 1999); *see also United States v. Gross*, 199 F. App'x 219, 232 (4th Cir. 2006); *United States v. Tedder*, 801 F.2d 1437, 1450 (4th Cir. 1986) ("[J]oinder is highly favored in conspiracy cases, over and above the general disposition towards joinder for reasons of efficiency and judicial economy."). Specifically, courts have recognized that severance

creates an unnecessary burden and inefficiency for the court, the government, and the witnesses, by requiring the presentation of the same case on multiple occasions. As a result, claims of potential prejudice generally are addressed through limiting instructions rather than severance. *See Zafiro*, 506 U.S. at 539; *United States v. Hayden*, 85 F.3d 153, 160 (4th Cir. 1996); Fed. R. Evid. 105.

### A.   The Defendants in this Case Were Properly Joined

As an initial matter, it is important to note that the defendants in this case were properly joined pursuant to Federal Rule of Criminal Procedure 8(b). Specifically, the defendants are charged in the same conspiracy and therefore plainly "are alleged to have participated in . . . the same series of acts or transactions constituting an offense or offenses." Fed. R. Crim. P. 8(b). Indeed, a case involving a single conspiracy is precisely the type of case in which co-conspirators should be tried together, since much of the evidence presented by the government in its case-in-chief will pertain to all of the defendants. *See, e.g.*, *Zafiro*, 506 U.S. at 537–38; *United States v. Akinkoye*, 185 F.3d 192, 197 (4th Cir. 1999), *cert. denied*, 528 U.S. 1177 (2000) ("Generally, we adhere to the rule that defendants charged with participation in the same conspiracy are to be tried jointly."). Accordingly, the presumption in this case is that the defendants should be tried together.

### B.   A Joint Trial Will Not Prevent the Defendants from Receiving a Fair Trial

A district court should grant a severance under Rule 14 only if there is a "serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539. There is no such risk in this case. Outside of the *Bruton* issue discussed below, Fields does not raise any specific basis for severance. None of the defendants have alleged irreconcilable defenses such that one defendant's claim of innocence depends upon a co-defendant's guilt. *See id*. at 538. The

defendants are roughly evenly matched in terms of their culpability; all are alleged to have committed multiple burglaries as part of a conspiracy in which stolen property was taken across state lines. Although the defendants did not all participate in each of the overt acts of the charged conspiracy, any risk of prejudice from perceived differences in their levels of relative culpability can be resolved by "less drastic measures [than severance], such as limiting instructions." *Zafiro*, 506 U.S. at 539; see also *United States v. Brugman*, 655 F.2d 540, 543 (4th Cir. 1981) ("The language of Rule 8(b) assumes certain evidence may be admitted against one defendant not necessarily applicable to another."); *United States v. Baker*, 10 F.3d 1374, 1388 (9th Cir. 1993) (finding no prejudice despite differences in culpability), cert. denied, 513 U.S. 934 (1994).

### C. Any *Bruton* Problem Can Be Addressed in Ways Less Drastic than Severance

The defendants also contend that severance would be required if the government were to violate the Confrontation Clause of the Sixth Amendment, as construed in *Bruton v. United States*, 391 U.S. 123 (1968), by introducing a non-testifying co-defendant's statement or confession naming the defendant as a participant in the crime. The government may seek to introduce post-Miranda recorded statement of Beckles or Fields, or the affidavits each of them filed in this case. However, should the government seek to introduce any of these admissions, all mentions of non-testifying co-defendants will be sanitized.

The proper remedy for a potential *Bruton* violation is not to sever the trials of the defendants, but instead to edit or redact the testimonial statement in order to eliminate the Confrontation Clause problem. As the Supreme Court held in *Richardson v. Marsh*, 481 U.S. 200, 211 (1987), the Confrontation Clause is not violated when a non-testifying codefendant's confession is redacted to eliminate any reference to the other codefendant's existence. Moreover, the Supreme Court has specifically held that there is no Sixth Amendment violation unless the

confession sought to be introduced contains "facially incriminating statements," rather than merely statements which become incriminating when linked to other evidence. *Richardson*, 481 U.S. at 208–09; see also *United States v. Akinkoye*, 185 F.3d 192, 197–98 (4th Cir. 1999), cert. denied 120 S.Ct. 1209 (2000) (finding that when a non-testifying codefendant's statement is redacted and read into evidence such that the statements do not refer to the existence of the defendant, severance is not required). In this case, Beckles' and Fields' statements and affidavits can be redacted and edited to eliminate any reference to non-testifying co-defendants. As trial approaches, the government will prepare proposed redacted versions of any of the statements or affidavits it may seek to introduce at trial.

Because the defendants are properly joined, no actual prejudice will result from the joint trial, and any *Bruton* problem can be resolved with sanitization, the motions to sever should be denied.

## V.      **THE DEFENDANTS' DISCOVERY MOTIONS SHOULD BE DENIED**

### A.  **The Defendant's Motion for Disclosure Pursuant to Fed. R. Evid. 404(b) and 609 Should be Denied as Premature**

The defendants have each filed motions for disclosure of Rule 404(b) evidence. (Dkt. #105 and 106 (Brown), 93 (Beckles), and 80 (Fields)). When introducing evidence under Rule 404(b), the trial judge can protect against creating undue prejudice by (1) providing a limiting instruction, when requested by a party, which explains to the jury the purpose of admitting evidence of other acts, and (2) enforcing the requirement in criminal cases that advance notice be given, when requested, of the intent to produce prior act evidence. *United States v. Queen*, 132 F.3d 991, 997 (4th Cir. 1997) In *Queen*, the court noted that when Rule 404(b) is administered according to those rules, "it will not . . . be applied to convict a defendant on the basis of bad character, or to convict him for prior acts, or to try him by ambush. But it will yet allow the admission of evidence of

similar prior acts that are probative of elements of the offense in trial." *Id. See also, United States v. Van Metre*, 150 F.3d 339 (4th Cir. 1998).

The Government has not yet prepared its trial strategy for the trial which is scheduled to commence in six months. The Government may file a motion pursuant to Fed. R. Evid. 404(b) at a later date, giving the defendants reasonable pretrial notice and a chance to present any challenge to such evidence to the Court with adequate time to consider whether it should be admitted at trial. The defendants' motions for disclosure of this evidence at this stage are premature, and should be denied.

**B.   Fields' Motion for Disclosure of Experts Should be Denied as Premature**

Fields has also filed a motion for disclosure of the government's experts (Dkt. #81), which Brown seeks to join (Dkt. #103). As with the motions under Rules 404(b) and 609, the government is still formulating its trial strategy at this stage. The government has already provided in discovery copies of reports of expert examinations that it may seek to introduce at trial. The government will make a formal disclosure of any experts it intends to call, and related expert materials, sufficiently in advance of the April 13, 2020, trial to allow the defendants ample time to prepare, including consulting their own experts. Thus, the Court should also deny this motion as premature.

**C.   Brown's Motion for Disclosure of Statements of Co-Defendants and Co-Conspirators Should be Denied as Moot**

Defendant Brown also moves to compel the government to identify, disclose, and produce the statements of any co-defendant or co-conspirator the government intends to offer against him. (Dkt. #107). Brown also seeks an order compelling the government to provide notice of the evidentiary basis upon which it will seek to introduce any such statements. Brown cites no precedent for such an order being issued. The potential *Bruton* issues he raises are addressed above.

The government has not yet produced the post-arrest recorded statements of any of the defendants to their co-defendants in discovery, however the substance of these statements have been provided in numerous reports, applications, and affidavits. The government intends to produce these recordings to all defendants in advance of the motions hearing scheduled in this case.

### D.  Brown's Motion for Disclosure Pursuant to Rule 12 Should be Denied as Moot

Defendant Brown moves to compel the government to disclose its intention to use any evidence that may be subject to a motion to suppress under Federal Rules of Criminal Procedure 12(b)(3)(C) and 12(b)(4)(B). (Dkt. #108). His motion should be denied as moot.

Rule 12(b)(4)(B) provides that the defendant may, "in order to have an opportunity to move to suppress evidence under Rule 12(b)(3)(c), request notice of the government's intent to use (in its evidence-in-chief at trial) any evidence that the defendant may be entitled to discover under Rule 16." Fed. R. Crim. P. 12(b)(4)(B).

Federal Rule of Criminal Procedure 12(b)(4)(B) has a limited purpose:

> Rule 12(b)(4)(B) is not designed or intended to be used to obtain more specific discovery than that provided by Rule 16 nor is it designed to aid the defendant in ascertaining the Government's trial strategy . . . Rather, Rule 12(b)(4)(B) is intended to facilitate efficient suppression motion practice by allowing the defendant to avoid filing a motion to suppress when the Government does not intend to use the evidence at issue.

*United States v. Barret*, 2011 WL 5579079, at *33 (E.D.N.Y. Nov. 16, 2011) (internal citations omitted); *see also United States v. de la Cruz-Paulino*, 61 F.3d 986, 994 (1st Cir. 2009) (stating that Federal Rule of Criminal Procedure 12(b)(4)(B)'s predecessor Rule 12(d) "was not designed to aid the defendant in ascertaining the Government's trial strategy"); *United States v. Ishak*, 2011 WL 4374804, at *1 (E.D. Va. Sept. 9, 2011) ("Put differently, defendants cannot invoke Rule 12(b)(4)(B) to force the government to decide precisely which documents provided in discovery

it will offer at trial and to prevent it from using any that it does not so designate as a matter of trial tactics.") (internal quotation marks omitted).

Moreover, Federal Rule of Criminal Procedure 12(b)(4)(B)'s "core purpose is to ensure that a defendant '*can make his motion to suppress prior to trial*' by 'requesting the government to give notice of its intention to use *specified evidence* which the defendant is entitled to discover under rule 16." *Ishak*, 2011 WL 4374804 at *1. Thus, in order to trigger Rule 12(b)(4)(B)'s notice obligation, "the defendant's request must identify potentially suppressive evidence with specificity." *Id.* at *2 (denying requests under Rule 12(b)(4)(B) as being "insufficiently specific" where defendants had simply requested that the government "designate its evidence and any calls, transcripts, and physical evidence pertaining to the defendant"); *see also United States v. Bunch,* 2009 WL 4784637, at *2 (E.D. Tenn. Dec. 8, 2009) (denying defendant' s request as overbroad since he had not specified any discoverable evidence).

Brown has specifically asked for (1) statements or "admissions by conduct" made by the defendant, including during any polygraph; (2) items, objects or information received as the product of a search executed by government agents; (3) recordings made pursuant to wiretaps; (4) recordings made pursuant to consensual recordings; (5) pre-trial identification procedures including line-ups; (6) any evidence arguably obtained in violation of federal, state, or local law; (7) grand jury testimony that the government has reason to suspect was perjured; and (8) any other information or material which might come under this rubric.

The government has turned over in discovery items responsive to Brown's first and second specific requests.

Brown's third, fourth and fifth specific requests are inapplicable in this case.

Brown's sixth and seventh specific requests fall within the government's *Brady* and *Giglio* obligations. The government has complied with its *Brady* and *Giglio* obligations and is aware of its ongoing responsibility to turn over such materials.

Thus, Brown's motion as to specific requests one though seven should be denied as moot.

As for Brown's eighth request, Defendant asks the Government to designate any evidence that might come under the "rubric" of Federal Rule of Criminal Procedure 12(b)(4)(B). Such a broad and vague request is insufficiently specific and should therefore be denied. *See, e.g.*, *Ishak*, 2011 WL 4374804 at *2.

### E. Brown's Motion to Require the Prosecution to Review and Confirm Witness Backgrounds Should be Denied

Finally, Brown moves to have the Court require the government to undertake a thorough vetting of each law enforcement witness, cooperator and expert. (Dkt. #111). Brown's motion should be denied.

As initial matter, Brown's request is without support in the Fourth Circuit and has been routinely denied by judges in this district. *See, e.g.*, *United States v. Langford*, No. 15-539-JKB, ECF No. 59 (D. Md. Sept. 23, 2016) (denying similar motion except to the extent that the Government shall comply with its *Brady* and *Giglio* obligations); *United States v. Boyd*, No. JKB-15-0401, ECF No. 51 at 2 (D. Md. Jan. 22, 2016) (denying similar motion except to the extent that the Government shall comply with its *Brady* and *Giglio* obligations); *United States v. Ventura*, No. WDQ-10-0770, 2013 WL 1455278 (D. Md. Apr. 18, 2013) (similar motion denied). Defendant relies instead primarily on the Ninth Circuit's holding in *United States v. Henthorn*, stating that if the defense makes such a request, the Government has a duty to examine the personnel files of law enforcement witnesses it intends to call at trial.  931 F.2d 29, 30 (9th Cir. 1991).

However, the Ninth Circuit in *United States v. Jennings*, 960 F.2d 1488, 1491 (9th Cir. 1992), and *United States v. Dominguez-Villa*, 954 F.2d 562, 565 (9th Cir. 1992), declined to follow *Henthorn*, finding that without "a clear basis in law or fact to believe that the [order] w[as] necessary", an order for the prosecution to personally review personnel files of law enforcement officers is beyond the supervisory power of the court. *Jennings*, 960 F.2d at 1491.

The government is aware of its obligations under *Brady v. Maryland*, 373 U.S. 83, 87 (1963) and fully intends to satisfy them. However, as the Fourth Circuit has noted "*Brady* does not create a full-scale, constitutionally-mandated discovery right for criminal defendants. Such a rule would impose an oppressively heavy burden on prosecutors . . ." *Spicer v. Roxbury Correctional Institution*, 194 F.3d 547, 555 (4th Cir. 1999). The Court should deny Brown's motion.

## VI.   **CONCLUSION**

For all of the above reasons, the Government respectfully requests that the defendants' pre-trial motions be denied or held in abeyance.

Respectfully submitted,

ROBERT K. HUR
United States Attorney

By:      _____/s/_____
Zachary A. Myers
Paul A. Riley
Assistant United States Attorneys
36 S. Charles Street, 4th Fl.
Baltimore, Maryland 21201